IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

CHRISTOPHER CARLSON,

                Plaintiff,                OPINION AND ORDER

  and

SECURITY HEALTH PLAN OF                21-cv-67-wmc
WISCONSIN, INC., and AFLAC,

                Involuntary Plaintiffs,

  v.

TRITON INDUSTRIES, INC., and
TRAVELERS PROPERTY CASUALTY
COMPANY OF AMERICA,

                Defendants.

---

In July of 2018, plaintiff Christopher Carlson suffered dismemberment of his little finger in a pinch-point on his pontoon boat's gate railing. Carlson is suing the boat manufacturer, defendant Triton Industries, Inc. ("Triton") for negligent design and failure to warn. Now before the court are the principal parties' cross motions for summary judgment (dkt. ##30, 58), as well as various motions to strike (dkt. ##40, 42, 56).[1] For the reasons given below, the court grants defendant Triton's motion for summary judgment.

---

[1] Triton's insurance carrier, defendant Travelers Property Casualty Company of America, and plaintiff's subrogated health care provider and insurance carrier, involuntary plaintiffs Security Health Plan of Wisconsin, Inc., and AFLAC, respectively, are also parties in this case but have not joined these pending motions.

UNDISPUTED FACTS

In July of 2018, Christopher Carlson was aboard a 20-foot-long pontoon boat manufactured by Triton in 1990. Triton sold at least 3,364 boats between 1988 and 1994 to approximately 220 dealers across 31 states and 4 countries. Specifically, Triton sold the pontoon boat at issue to a now dissolved dealer located in Genesse Depot, Wisconsin, in May of 1990. Plaintiff believes that James Weninger purchased the boat new from that dealer and owned it for 13 or 14 years before selling it to Carlson in 2004 or 2005.

The parties do not have direct knowledge of the boat's chain of title, since neither Carlson nor any previous owner registered his ownership of the boat with Triton after its original purchase and there are no documents of Carlson's purchase from Weninger. Similarly, Carlson never brought the boat to a dealer for service. Still, Carlson did register the pontoon boat with the Wisconsin Department of Natural Resources ("DNR") in his name in 2007, after its previous registration expired. Before 2007, the boat was registered to Weninger, and the DNR does not have records of the boat belonging to anyone besides Carlson and Weninger.

After some thirteen or fourteen years of ownership, Carlson apparently jumped out of the boat in July 2018 while enjoying a day on the water with his wife and three children. Unfortunately, three of his fingers got pinched at a point in the pontoon's gate railing as he jumped, resulting in the traumatic dismemberment of his little finger on his right hand, along with connective tissue torn from his right hand, wrist, and arm.

Since this pinch-point accident, Carlson has used the boat at least three more times. Yet he has not added any pinch-point protections himself, despite such protectors being

inexpensive and widely available. Carlson claims this is because now that he is aware of the risk, he can safely avoid the pinch points along the railings.

OPINION

I. Motions to Strike

    A. Arthur Faherty Expert Report

As an initial matter, Triton moves to strike Arthur Faherty's expert opinion testimony because plaintiff failed to submit a timely, complete expert report compliant with Rule 26(a)(2)(B), making any attempt to supplement untimely as well. Specifically, at the expert disclosure deadline on October 1, 2021, plaintiff had only submitted a bullet-point letter from Faherty identifying the subjects about which he was expected to testify. (Def.'s Br. (dkt. #41) 5-7.) Plaintiff provided no other information until December 1, 2021, when he finally filed Faherty's expert report, fully 61 days after it was due. (Def.'s Br. (dkt. #41) 2.)

Among other things, an expert report "must contain: . . . a complete statement of all opinions the witness will express" . . . "the basis and reasons for them," . . . and "the facts or data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2)(B)(ii). Under Rule 37, if a party "fails to provide the information . . . required by Rule 26(a)," then "the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The following factors are relevant in considering whether previously undisclosed evidence should be admitted: "(1) the prejudice or surprise to the party against

3

whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003) (citing *Bronk v. Ineichen*, 54 F.3d 425, 428 (7th Cir. 1995)).

Plaintiff does not deny that his disclosures were late or explain his failure to provide the information sooner; instead, he argues that defendant Triton was not prejudiced, and any error was harmless. (Pl.'s Opp'n. (dkt #47) 2.) While plaintiff clearly failed to meet his Rule 26(a)(2) disclosures timely, motions to strike are generally disfavored and the court is loath to have the results in this case turn solely on procedural missteps, especially when the defendant was not prejudiced. *United States v. 416.81 Acres of Land*, 514 F.2d 627, 631 (7th Cir. 1975). Here, while plaintiff should have disclosed his expert report on time, Triton was ultimately able to depose Faherty, as well as respond to his principal opinions. Thus, the court will not strike Faherty's opinion as a whole.[2]

In the alternative, Triton moves to exclude Faherty's opinion that Triton could have readily warned customers of the risks associated with pinch points on the rails of its pontoon boats by accessing owners' registration information through the Wisconsin

---

[2] Triton also moved to strike plaintiff's motion for summary judgment and proposed findings of fact (dkt. #58), as well as plaintiff's medical witnesses (dkt. #42). No information from the medical witnesses was reviewed for this summary judgment, so that motion will be denied as moot. Regarding plaintiff's motion for summary judgment and proposed findings, defendant asked for them to be struck because they were filed a week after the court's deadline. On this, defendant is largely mistaken, since a cross-motion may be considered by the court under Rule 56(f), especially if the non-movant is principally seeking judgment on a matter already put in issue by the movant. Regardless, because the court does not find Triton liable, a review of plaintiff's summary judgment motion is unnecessary and defendant's motions to strike (dkt. ## 66, 73) will also be denied as moot. Still, plaintiff's counsel is reminded that it is poor practice to file disclosures and motions untimely, and that under different circumstances, adverse consequences may well have followed.

4

Department of Natural Resources. Expert testimony is guided by Federal Rule of Evidence 702, which the Supreme Court has interpreted to allow testimony if found to be both reliable and relevant. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 588 (1993). In turn, the Seventh Circuit has boiled down the requirements of Rule 702 to the following three areas of inquiry: (1) the proffered expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of the expert's testimony." *Gopalratnam v. Hewlett-Packard Company*, 877 F.3d 771, 779 (7th Cir. 2017).

In this case, Faherty opines that Triton should have affirmatively provided every state agency across the United States with a list of the affected boats by Hull Identification Number, from which the DNR "would likely have been able to identify registered owners." (Def.'s Rep. to Pl.'s Resp. to Def.'s PFOF (dkt. #69) ¶¶ 42, 43). However, Faherty admits that he: (1) never spoke with the DNR; (2) has no idea if the DNR could have searched a database for the relevant time period; and (3) is unaware of whether the DNR could have connected Triton with boat owners. (Def.'s Rep. to Pl.'s Resp. to Def.'s PFOF (dkt. #69) ¶¶ 44-46). Ultimately, Faherty's opinion appears to be based solely on his own thoughts and feelings, rather than any actual knowledge about the DNR or its practices in notifying registered boat owners as to such problems. Plaintiff also fails to address defendant's main criticism as to the admissibility of Faherty's purported expert opinions that they are unsupported by facts or data, and instead rely on the argument that expert testimony is not needed for the jury to find a substantial likelihood that issuance of a warning would have reached customers. (Pl.'s Opp'n. (dkt #47) 8.)

The fact that expert testimony specifically may not be necessary is irrelevant to the separate question of whether Faherty's expert opinion is supported and reliable. Because Carlson and Faherty provide no support for Faherty's opinion that getting word to boat owners through state agencies is feasible, other than common sense, his "expert" opinion will be excluded. In short, having failed to disclose any specialized knowledge or expertise, Faherty will not be allowed to opine that what he's proposing is possible.

### B. Robert Taylor Expert Report

Plaintiff similarly seeks to limit the opinion testimony of defendant's expert Robert Taylor warning communications like those distributed by previous boat companies were unlikely to reach Carlson. (Pl.'s Mot. (dkt. #57) 2.) Plaintiff argues that this opinion is also unsupported and outside of Taylor's expertise as a naval engineer. *Id*. In response, Triton states that Taylor's opinion on the efficacy of warnings is based on his knowledge of and expertise about the boating industry. (Def.'s Opp'n. (dkt. #72) 2-3.) In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court held that an expert's opinion need not be limited just to scientific knowledge, but that industry or experience-based knowledge is an appropriate basis for expert opinion testimony as well. *Id*. at 141. Taylor's opinion appears to fit within this latter category, and his long experience in the field of naval architecture and marine engineering is sufficient to suggest he may have knowledge to share not otherwise available to a lay jury. (Taylor CV (dkt. #37-5) 1.) To plaintiff's concerns that Taylor's opinions have holes in them, "[t]he fact that an expert's testimony contains some vulnerable assumptions does not make the testimony irrelevant

6

or inadmissible"; rather, "this arguable limitation can … be addressed through cross-examination." *Stollings v. Ryobi Technologies, Inc.*, 725 F.3d 753, 768 (7th Cir. 2013).

## II. Summary Judgment

Summary judgment must be granted against a party who fails to make a showing sufficient for a reasonable jury to find the existence of an element essential of a claim upon which that party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). However, if there is any genuine dispute as to a material fact on which a party's claim depends, the court must deny summary judgment. *Id*. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). Finally, at summary judgment, "[t]he evidence of the non-movant[s] is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Id*. at 255.

In briefing at summary judgment, plaintiff has *not* opposed the entry of final judgment against him on his claims of strict liability, breach of warranty and gross negligence. (Pl.'s Opp'n (dkt. #53) 3-4.) As a result, only plaintiff's negligence claims remain for the court to decide at summary judgment. Plaintiff's two, main theories of recovery are based on a negligent design and a negligent, post-sale failure to warn. The court assesses the merits of each theory in turn below.

### A. Negligent Design

For any tort, a plaintiff must "establish the following four elements: '(1) the existence of a duty of care on the part of the defendant, (2) a breach of that duty of care,

7

(3) a causal connection between the defendant's breach of the duty of care and the plaintiff's injury, and (4) actual loss or damage resulting from the [breach].'" *Hoida, Inc. v. M & I Midstate Bank*, 2006 WI 69, ¶ 23, 291 Wis. 2d 283, 302–03, 717 N.W.2d 17, 26–27 (quoting *Gritzner v. Michael R.*, 2000 WI 68, ¶ 19, 235 Wis. 2d 781, 611 N.W.2d 906). Additionally, "whether a duty exists and the scope of such a duty are questions of law for the courts to decide." *Hoida, Inc. v. M & I Midstate Bank*, 2006 WI 69, 291 Wis. 2d 283, 303, 717 N.W.2d 17, 27. Looking first to the claim for design defect, plaintiff cannot establish that Triton had a duty of care. Even if Triton had a duty, plaintiff is also unable to establish a breach. As such, summary judgment in favor of the defendant is warranted.

The Wisconsin Supreme Court directly addressed the requirements for a negligent design suit in *Morden v. Cont'l AG*, 2000 WI 51, 235 Wis. 2d 325, 356, 611 N.W.2d 659, 674 (2000), in which plaintiff was injured when her car tire burst, causing a crash that led to her paralysis. For the duty of care element, the court looked at, "whether there was any credible evidence or inference therefrom to support the finding that Continental knew or, in the exercise of ordinary care, should have known, that the tires posed a foreseeable risk of injury." *Id*. at ¶ 48.

Here, at the time of manufacture in 1990, plaintiff has produced *zero* evidence that Triton knew or should have known that its railing design was a pinch-point hazard, which is an essential element of negligent design. First, plaintiff is unable to identify *any* boat manufacturer in 1990 that used pinch-point protectors. (Def.'s Rep. to Pl.'s Resp. to Def.'s PFOF 32). Second, plaintiff does not even *suggest* that Triton had actual knowledge about pinch point hazards on its pontoon railings in 1990. Third, as to whether Triton *should*

8

*have* known, plaintiff principally argues that Triton should have known about pinch-point hazards in general and applied that knowledge to its design process.

In fairness, plaintiff's expert does offer, however belatedly, two tenuous pieces of evidence that the *boating industry* should have known about pinch point hazards in 1990. (Faherty Dep. (dkt. #34) 60:18-61:19.) As an initial matter, plaintiff's expert Faherty points out that the National Safety Council defined 'pinch points' in 1974. However, Faherty admits that: (1) the National Safety Council definition was not discussed in the context of boats; and (2) the National Safety Council's current webpage on boating safety does not discuss pinch points. (Faherty Dep. (dkt. #34) 61:10-62:8.) Faherty also points out that Occupational Safety and Health Administration ("OSHA") guidelines from 1978 talk about pinch point hazards, but in the context of workplace safety, which Faherty again admits is unrelated to boats or boat design. (Faherty Dep. (dkt. #34) 60:18-61:19, 62:18-63:14.) And while defendant's expert acknowledges pinch points "should be avoided if they're recognized," he also clarified that "in the machine world …. pinch points tend to be more thought of as rotating equipment, exposed gears, the transmission of power from one part of the factory to another." (Taylor Dep. (dkt. #47-2) 51:15-51:18, 52:16-52:20.) In the end, therefore, plaintiff provides evidence that the concept of pinch points was *known* in 1990, but has not provided the connecting thread that pinch points were well recognized as a hazard in boat design generally, much less with pontoon railings. The fact that some industries knew that pinch points existed is not enough for a reasonable jury to infer that Triton should have been aware its 1990, state-of-the-art railing design could cause a pinch point injury.

9

Indeed, plaintiff's expert Faherty concedes that pinch point protectors for boats were not even developed until the 2000s, over 10 years after the construction of this boat. (Faherty Dep. (dkt. #34) 65:25-66:10.)  Even taking plaintiff's evidence generously as to Triton's later notice of injuries, which defendant would dispute, Triton did not hear about any pinch point injury associated with its pontoon boat design until 1991 *at the earliest*. (Def.'s Resp. to Pl.'s PFOF (dkt. #69) ¶ 14.)  Nor does either side show that *any* boating company knew about the risk of pinch point injuries from boat railings before 1990.

Thus, there is a complete lack of evidence from which a reasonable jury could infer that Triton should have known to develop and install pinch protectors when designing its pontoon railing in 1990, much less that it did, in fact, know that pinch points on boats posed a foreseeable risk of injury.  Under Wisconsin law, therefore, Triton did not have a duty of care in 1990 to design away from pinch-points or to include protectors when plaintiff's boat was designed and built.  And even if Triton had a duty of care, defendant has also shown that it did not breach that duty under Wisconsin law, which defines a product as negligently designed only

> if the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the manufacturer and the omission of the alternative design renders the product not reasonably safe.

Wis. Stat. § 895.047.  Specifically, the standard of care is that of a reasonable person, and the parties may "present evidence as to the custom in the industry (what the industry was doing) and the state of the art (what the industry feasibly could have done) at the time of the design, manufacture, and sale" as evidence that it met the standard of care.  *D.L. by Friederichs v. Huebner*, 110 Wis. 2d 581, 616–17, 329 N.W.2d 890, 907 (1983).  As

previously noted, defendant has demonstrated, and plaintiff has essentially conceded, that no custom existed of installing pinch-point protectors in the boating industry at the time the pontoon at issue was built. Indeed, plaintiff's own expert admits that Triton's pontoon boat complied with all boating industry standards in 1990. (Def.'s Rep. to Pl.'s Resp. to Def.'s PFOF at 11.)

Of course, plaintiff argues that the fact that no other boat company was using pinch-point protections does not necessarily absolve Triton of liability. In particular, the Wisconsin Supreme Court has held that "[c]ustomary practice is not ordinary care but is evidence of ordinary care." *D.L.*, 110 Wis. 2d 581, 619, 329 N.W.2d 890, 906 (1983).[3] Thus, "[a] whole industry may be negligent in failing to adopt new and available devices," *id.*, and plaintiff argues that Triton should have installed pinch point protectors in 1990, even if the rest of the boat industry admittedly did not. Still, this argument ignores that plaintiff offers *no* evidence pinch point protectors were available or had even been developed for boats. Accordingly, unlike in *Morden*, where the Wisconsin Supreme Court concluded that "[e]xisting technology addressed the danger of belt separation in the manufacture of radial tires" before the product at issue was designed, the need for pinch-point protector technology for for boats was not yet in the works, or at least plaintiff has failed to offer any evidence from which a jury could find otherwise.

Finally, even if a reasonable jury could somehow find that Triton should have known to install pinch-point protectors in 1990, Wisconsin "courts have held that a

---

[3] However, the reverse is also true: "nonconformance with industry custom is not conclusive proof of a failure to exercise ordinary care." *Morden,* 235 Wis. 2d at 359.

11

showing by a plaintiff that better methods of manufacture exist does not conclusively prove that a defendant created the product with a lack of ordinary care." *Morden*, 235 Wis. 2d at 359, (citing *Locicero v. Interpace Corp.*, 83 Wis. 2d 876, 890 266 N.W.2d 423 (1978)). Rather, "under this approach, negligence usually attaches only when the plaintiff can prove that the defendant selected the more dangerous route of manufacture knowing that it was unsafe." *Id*. Since plaintiff here has offered no proof that *any* boat company had even considered installing pinch-point protectors, he cannot reasonably argue that Triton affirmatively *chose* not to install those protectors, much less knew that failing to do so would be the more dangerous option.

### B. Negligent Failure to Warn

This just leaves plaintiff's claim that Triton had a duty to warn owners of emerging risks even after selling the boat. The court finds that Triton had no such duty based on the limited evidence offered by plaintiff at summary judgment. To begin, there is no "absolute continuing duty, year after year, for all manufacturers to warn of a new safety device which eliminates potential hazards" under Wisconsin law; instead, post-sale warnings are called for under certain circumstances. *Kozlowski v. John E. Smith's Sons Co.*, 87 Wis. 2d 882, 901, 275 N.W.2d 915, 923–24 (1979). The main requirements for establishing a *post-sale* duty to warn are set out in *Kozlowski*. Specifically, Wisconsin courts have

> derived from *Kozlowski* four prerequisites to liability for the post-sale failure to warn: (1) a relatively limited industry and market, in which it is feasible for the manufacturer to know who has purchased its product and to communicate safety improvements to them; (2) proof that the manufacturer

12

> learned, or should have learned, about a defect in the product after it was sold; (3) development of a safety device by the manufacturer in response to the defect; and (4) the manufacturer's failure to notify its customers of the defect and of availability of the safety device

*Wisconsin Health Care Liab. Ins. Plan v. Ohmeda, a Div. of BOC Grp., Inc.*, 77 F.3d 485 (7th Cir. 1996). Defendant only disputes the first factor here. (Def.'s Op. Br. (dkt. #31) 16.) The exact criteria for a "relatively limited industry" are vague, but a review of Wisconsin caselaw provides some clarity.

Regarding market size, the Wisconsin Supreme Court in *Kozlowski* considered the death of a man engaged in cleaning a sausage stuffing machine, finding that "[t]he sale of the sausage stuffer is to a limited market wherein the manufacturer should know of all companies that own its product." *Kozlowski*, 87 Wis. 2d at 900–01. To this point, the court emphasized that "[a] safety device for the machine was developed in 1946 and became standard equipment on the machine after 1971. However, during two visits to the factory, a manufacturer's representative never informed decedent's employer of the safety device, nor of the hazard it was designed to prevent." *Gracyalny v. Westinghouse Elec. Corp.*, 723 F.2d 1311, 1318 (7th Cir. 1983) (citing *Kozlowski*, 87 Wis. 2d at 901). Given that the product was a highly specific, industrial meat machine and the manufacturer's representative continued to visit the factory where the machine remained in use, the *Kozlowski* court found the feasibility of a warning and the likelihood that the company knew who owned its product was clear. *Id*. at 901.

Since *Kozlowski*, Wisconsin courts have provided further guidance as to what constitutes a "relatively limited industry and market in which it is feasible for the

13

manufacturer to know who has purchased its product and to communicate safety improvements to them." For example, technical and specialized equipment, like industrial sausage stuffers and hospital-grade anesthesia machines, have been found to satisfy this requirement, while a tractor with an attached hay baler has not. *See Olsen by Olsen v. Ohmeda, Div. of Boc Grp., Inc.*, 863 F. Supp. 870, 875 (E.D. Wis. 1994), aff'd sub nom. *Wisconsin Health Care Liab. Ins. Plan v. Ohmeda, a Div. of BOC Grp., Inc.*, 77 F.3d 485 (7th Cir. 1996) (anesthesia machine); *Sharp v. Case Corp.*, 216 Wis. 2d 113, 573 N.W.2d 899 (Ct. App. 1997), aff'd sub nom. *Sharp ex rel. Gordon v. Case Corp.*, 227 Wis. 2d 1, 595 N.W.2d 380 (1999) (hay baler).

Perhaps the most thorough analysis of the contours of the first *Kozlowski* factor comes in *Bushmaker v. A. W. Chesterton Co.*, No. 09-CV-726-SLC, 2013 WL 11079371, at *8 (W.D. Wis. Mar. 1, 2013). In *Bushmaker*, this district noted that the feasibility of a warning seemed crucial to the first *Kozlowski* factor. For instance, the court in *Sharp* suggested that a jury could find liability if a company "failed to implement adequate remedial measures, such as post-sale warnings, that were available and inexpensive." *Sharp ex rel. Gordon v. Case Corp.*, 227 Wis. 2d 1, 23–24, 595 N.W.2d 380, 390 (1999). The *Bushmaker* court also noted that the Restatement of Torts found a post-sale duty to warn when "those to whom a warning might be provided can be identified and can reasonably be assumed to be unaware of the risk of harm; and . . . a warning can be effectively communicated to and acted on by those to whom a warning might be provided." Restatement (Third) of Torts: Prod. Liab. § 10 (1998). "Although Wisconsin has not adopted § 10 of the Restatement (Third)," the court found that these factors "appear to

be consistent with the Wisconsin Supreme Court's discussion in *Kozlowski* of the need to evaluate the nature and scope of the industry and the discussion in *Sharp* regarding evidence showing that the provision of a post-sale warning was both feasible and effective." *Bushmaker*, No. 09-CV-726-SLC, 2013 WL 11079371, at *8. Accordingly, this court held that "in order for a duty to warn, post-sale, to exist, the plaintiff must have some evidence of the sort presented in *Sharp*, namely that it was both practically and economically feasible for the defendant to have provided warnings and that any warnings would have been effective in reaching the users of its products." *Id*.

Thus, the lesson drawn from *Kozlowski* and subsequent its progeny is that the feasibility and effectiveness of a post-sale warning in a relatively limited industry and market is crucial to whether the duty to give such warning exists in the first instance, rather than the specific characteristics of the industry alone. Most notably, courts that have found this standard has been met have emphasized that there was *evidence* that the manufacturing company knew of and could contact its customers. In *Kozlowski*, the company had previously mailed out trade publications that evidently reached *all* of its customers *and* representatives for the machine manufacturer made visits to the factory at hand. 87 Wis. 2d at 900. In *Sharp*, the court noted that "[t]here was evidence of the means available to Case to reach tractor purchasers." 216 Wis. 2d 113. So, too, was the case in *Olsen*. 863 F. Supp. at 875 (finding "[t]he evidence disclosed that the manufacture and marketing of anesthesia machines is conducted in a narrow industry and market").

Here, plaintiff offers almost no evidence as to the feasibility of a warning, leaving the finder of fact no choice but to guess whether Triton could have warned consumers

generally and this plaintiff in particular. In fairness, plaintiff and his erstwhile expert posit several, possible methods of providing such a warning, all of which defendant Triton argues are impractical and would not have reached Carlson. More importantly, plaintiff has no factual or expert testimony that suggests any of these methods were even possible, much less feasible. First, plaintiff and his expert suggest that Triton should have contacted the Department of Natural Resources in each state and used boat registration rolls to identify and warn owners. (Pl.'s Opp'n. (dkt. #53) 16.) Plaintiff's sole evidence that this method is feasible is expert testimony from Faherty, which the court has already excluded for unreliability. Regardless, as previously noted, Faherty admitted that he (1) never even spoke with the Wisconsin DNR; (2) has no idea if the DNR could have searched a database for the relevant time period; and (3) does not know if the DNR could have connected Triton with boat owners. (Def.'s Rep. to Pl.'s Resp. to Def.'s PFOF (dkt. #69) ¶¶ 44-46). Even if Faherty's opinion on this matter was allowed in, therefore, he does not have any underlying basis to support it.

Second, plaintiff argues that Triton should have sent notices to each distributor that sold Triton pontoon boats. (Pl.'s Opp'n. (dkt. #53) 15.) Again, there is no evidence that such a strategy would have reached Carlson or other second or third hand purchasers. On the contrary, for any warning sent after 1996, the dealer who made the original sale of the pontoon boat, Kwik Service, Inc., had already closed and would not have received it, nor is there any evidence that Kwik Service or other Tritan dealers would be aware of an original customer's sale of a boat downstream to someone like Carlson. Moreover, warnings provided to other dealers while Carlson owned the boat would not have reached

16

him, as he has admitted never even taken the boat to a dealer for service. (Def.'s Rep. to Pl.'s Resp. to Def.'s PFOF (dkt. #69) ¶ 48.) Finally, while Kwik Service may have received a 1992 or 1994 warning, again, plaintiff and his expert admit that pinch-point safety devices for boat railings were not available until the 2000s, meaning that "there was no new safety device to warn its users about in 1994." (Def.'s Op. Br. (dkt. #31) 16.) In particular, plaintiff has been unable to identify a single pinch-point protector available for sale for boats before 2000, which was long after Kwik Service had collapsed. Even if there were an available safety fix before the 2000s, any warning would have depended on the previous owner, Weninger, receiving the note and acting to implement pinch protectors or providing a "heads up" to Carlson on resale.

Third, plaintiff suggests that "Triton could have taken the time to identify repair shops and marinas near the known points of sale in order to get notices out to more people," while acknowledging that Triton sold boats in 31 states across 4 countries. (Pl.'s Opp'n. (dkt. #53) 16.) On its face, this method is far from feasible and requires casting an incredibly large net, and it falls squarely on the other side of the line drawn by Wisconsin courts since *Kozlowski*. Accordingly, then, plaintiff has failed to advance sufficient evidence for a reasonable jury to find any of his proposed methods of warning were possible, much less feasible for Triton to know "who purchased its pontoons and communicate safety improvements to them" as required by *Kozlowski*.

Further solidifying the court's ruling, defendants have pointed to numerous undisputed facts that cast substantial, additional doubt on plaintiff's proposed strategies. Particularly, as here, where any duty to warn post-sale seems to fall short of the legal line

drawn by Wisconsin courts, plaintiffs *at minimum* should have offered robust evidence at summary judgment of the feasibility of giving notice to what is at best a secondhand owner of a pontoon boat built in 1990. *See Schacht v. Wisconsin Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999) (holding that summary judgment is "the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.") In fact, it is undisputed that this plaintiff failed to install pinch protectors even after severely injuring his hand. Rather, Carlson has continued to use his pontoon boat without installing pinch protectors, although cheap and readily available. (Def.'s Rep. to Pl.'s Resp. to Def.'s PFOF (dkt. #69) ¶ 40.) Even plaintiff's excuse that he has not installed protectors because he now knows what pinch-point areas of the boat's railings to avoid rings hollow. Although not dispositive, if a traumatic dismemberment has not convinced Carlson to install pinch-point protectors, a reasonable jury would have great difficulty in finding that a manufacturer letter would have, especially when plaintiff's own children and any guests on the boat remain at risk regardless of how savvy Carlson might now personally be about the risk.

Regardless, the degrees of separation between Triton, its hundreds of dealers and original purchasers, much less second-hand purchasers like Carlson, are such that any warning was diminishingly unlikely to reach him and prevent his injury. In particular, Carlson not only bought the boat at least second hand, but was never in contact with Triton or one of its dealers, never brought the boat to a dealership, and only registered the boat in his name in 2007, several years after purchasing it. Thus, plaintiff has failed to advance sufficient evidence of the feasibility and effectiveness of a warning by Triton to

proceed to trial under Wisconsin law since *Kozlowski*. Indeed, whatever the arguable benefits of such warnings as a matter of policy, post-sale warnings are now somewhat disfavored because "[i]t would place an unreasonable duty upon … manufacturers if they were required to trace the ownership of each unit sold and warn annually of new safety improvements over a 35 year period." *Kozlowski*, 87 Wis. 2d at 901. Were Wisconsin caselaw less averse to imposing the burden of post-sale warnings unless feasible *or* plaintiff had provided robust evidence of feasibility, the court might have let this case go forward to a jury. In the absence of both, however, the court is convinced that no reasonable jury could find for plaintiff. Thus, Triton had no post-sale duty to warn or, at the very least, plaintiff has failed to meet his burden of production from which a reasonable jury could find otherwise under Wisconsin law.

Given that Triton is not liable under either of plaintiff's negligence theories, it follows that Triton is also not liable for a failure to recall, which is a much more drastic measure and wholly unsupported by the record before the court or, indeed, even plaintiff's expert. (Def.'s Op. Br. (dkt. #31) 14.)

ORDER

IT IS ORDERED that:

1) Defendant's motion for summary judgment (dkt. #30) is GRANTED.

2) Plaintiff's motion for summary judgment (dkt. #58) is DENIED AS MOOT.

3) Defendant's motion to strike Arthur Faherty's expert report (dkt. #40) is GRANTED IN PART and DENIED IN PART.

4) Defendant's motion to strike plaintiff's medical witnesses (dkt. #42) is DENIED AS MOOT

5) Plaintiff's motion to limit Robert Taylor's testimony (dkt. #56) is DENIED.

6) The clerk's office is directed to enter judgment in defendant's favor and close this case.

Entered this 1st day of June, 2022.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge